Filed 3/9/22  P. v. Gordon CA2/8

Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B286809 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA095166) |
| v. | |
| CLIVE GORDON et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, James Brandlin, Judge.  Affirmed with modifications.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant Clive Gordon.

Melissa L. Camacho-Cheung and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Acosta.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

In 2017, a jury convicted appellants Clive Gordon and Carlos Acosta of carjacking (count 1), robbery (count 2), and two attempted robberies (counts 3 & 4)[1] involving three victims who were admiring a new car belonging one of the victims. Appellants, accompanied by Cesar S., used guns to obtain cash from the car's owner. When the car spontaneously started up, Cesar S. got in and drove away in the vehicle, with at least one of appellants in the passenger seat. Appellants are gang members and the crimes were committed in territory claimed by a rival gang.

The jury found true allegations that the offenses were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C). The jury also found true allegations that each appellant personally used a firearm in the commission of the count 2 robbery, the count 4 attempted robbery, and the count 1 carjacking; the jury found Acosta personally used a firearm in the commission of the count 3 attempted robbery. (§ 12022.53, subds. (b) & (e)(1).) The trial court sentenced Gordon and Acosta each to a term of 25 years to life for the carjacking. The court sentenced appellants concurrently for the robbery, attempted robberies and associated enhancements -- Acosta to a term of 37 years eight months and Gordon to a term of 36 years four months.

Appellants appeal from the judgments of conviction, asserting 12 claims of error. One such claim of error is the trial court's decision to instruct the jury pursuant to CALCRIM No. 315 that certainty could be considered in evaluating

---

[1] Further undesignated statutory references are to the Penal Code.

eyewitness testimony. On August 13, 2019. we affirmed the convictions, with minor sentencing corrections and modifications.

Appellants filed a petition for review with the California Supreme Court, which was granted on November 26, 2019. The Supreme Court held the case pending its decision in *People v. Lemcke* (S25108) as to the propriety of CALCRIM No. 315 concerning eyewitness identification.

On May 27, 2021, the Supreme Court issued its opinion in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). On August 25, 2021, the Supreme Court transferred this matter to us with directions to vacate our decision and reconsider the cause in light of *Lemcke*. We then requested and received supplemental briefing from the parties. Appellants requested and received permission to a file supplement brief on the impact of Assembly Bill No. 333 (Assembly Bill 333), which became effective January 1, 2022 and made numerous amendments to section 186.22. Respondent filed a brief on this issue as well.

We now vacate and reconsider our decision in light of *Lemcke*, and also consider the impact of Assembly Bill 333 on the section 186.22 allegation in this case. As part of our reconsideration of these issues, we revisit Gordon's contention the trial court abused its discretion in admitting a video of him expressing gang-related animus towards rival gangs because that video was inflammatory and had no probative value. We also revisit Acosta's claim that his counsel was ineffective in failing to challenge the photographic lineup used by police, which Acosta characterizes as impermissibly suggestive.

We briefly summarize appellants' other contentions Both appellants contend the trial court erred legally and factually in permitting the jury the option of convicting them of carjacking

3

under the natural and probable consequences doctrine. We hold there is no rule that carjacking cannot be the natural and probable consequences of robbery; this is a fact-dependent question. There is sufficient evidence to show that Cesar S. aided and abetted appellants' robberies before he committed the carjacking, rendering him a participant in all the target crimes.

Both appellants claim the trial court erred in modifying the standard jury instruction on traditional aiding and abetting principles. It is well settled this modification does not render the instruction argumentative or misleading.

The second half of appellants' claims relate to sentencing. Appellants contend the trial court erred in failing to stay their sentences on the count 2 robbery conviction pursuant to section 654. We discern substantial evidence supports a finding of multiple objectives in appellants' commission of the robbery and the carjacking. Gordon contends the trial court relied on improper factors in sentencing him to the upper term for the robbery conviction. The trial court's remarks demonstrate its decision rested entirely on two proper sentencing factors. Both appellants were 18 years old at the time they committed the offenses in this case and they contend this matter must be remanded to afford them an opportunity to make a record of youth-related mitigating evidence for their eventual youthful offender parole hearing. Appellants have failed to show they were not afforded such an opportunity in the trial court.

We agree the abstracts of judgment must be corrected and the gang enhancements to the sentences on the attempted robbery convictions modified, as is set forth in more detail in our disposition. Those corrections and modifications have already been made as a result of our original decision.

We vacate the true findings on the section 186.22 gang enhancement allegation, and remand for further proceedings. We affirm the judgments of conviction in all other respects.

## BACKGROUND

I.    *The Crimes*

On September 13, 2016, between approximately 6:30 and 7:00 p.m, Joe Walker and Mercure Washington were looking at Ronald Taylor's new Mercedes convertible, which was parked on the street in front of Walker's house on West 123rd Street in Los Angeles. Taylor was in the driver's seat with the engine running, but he got out of the car to look at the trunk with Walker and Washington. Taylor left the engine running and the fob for the keyless ignition in a cup holder. The car had an "ecosystem" which automatically turned the car off when it was stopped or when the driver leaves the vehicle. The car "sometimes . . . will just turn itself back on."

As the three men were looking at the trunk, a Lincoln momentarily stopped about a block away and three young men got out of the car. Victims Taylor, Walker and Washington later identified appellants Gordon and Acosta as two of the men. They also identified Cesar S., who was charged in a separate case as a juvenile. The three young men from the Lincoln walked toward Taylor, Walker and Washington. Walker observed that Gordon

5

and Acosta were wearing Green Bay Packers jerseys; Washington noticed that Acosta was wearing a Green Bay Packers cap.

Gordon reached the car first, with Acosta a few feet behind him, and Cesar trailing behind them. Gordon said, "Nice car." Taylor thanked him. Gordon asked either "How much do you want for the car?" or "How much was the car?" Walker replied jokingly, "A hundred thousand dollars." Gordon said, "Empty your pockets then."

Taylor looked up and realized Gordon was holding a semi-automatic handgun. Taylor was unable to describe how Gordon was holding the gun. According to Washington, Gordon was holding the gun inside his jacket at about waist height. Acosta, standing slightly farther back, was pointing a semi-automatic handgun at Taylor, Walker and Washington. Taylor took about $140 to $160 in cash from his pocket and handed it to Acosta. Washington turned his pockets inside out to show he did not have any cash or valuables. Walker said, "I ain't giving you shit," and walked away to his house.

According to Washington, the Mercedes, which had earlier turned off, started up again automatically. Walker reappeared at the side of his garage and the "guys with the guns took off running." Cesar got into the driver's seat. Gordon got into the passenger seat. Acosta pointed his gun toward Walker before turning and running. As Acosta ran by Washington, Gordon yelled at Acosta to get the chain which Washington was wearing around his neck. Acosta did not do so. The Mercedes took off. Acosta continued down the street to the corner and got into the Lincoln, which had reappeared.

According to Taylor, after Walker went towards his house, the Mercedes re-started on its own. Cesar, who had been moving

6

closer to the car during the robbery, was now by the driver's side. He got into the car. Acosta still had his gun out. According to Taylor, Acosta got into the Mercedes and as the Mercedes started to pull away, Gordon jumped into the Mercedes as well.

Taylor and Walker drove to the corner and flagged down a patrol car. Washington called 911 a few minutes after they left; the call was logged at 7:08 p.m.

II.    *The Investigation*

About two weeks later, on September 25, 2016, police found Taylor's Mercedes on Berendo Avenue in Gardena. It had a few dings and scratches. The car was returned to Taylor, who noticed that some personal items were missing from the vehicle.

On November 2, 2016, Taylor, Walker and Washington each separately viewed a photo book with 18 photos and each identified Acosta as one of the robbers with a gun. Taylor and Washington also identified Gordon as the other robber with a gun. Taylor said he was sure of his identification. Although Walker did not identify Gordon in the photographic line up, he was "99 percent" Gordon was one of the two armed robbers after seeing him in court. Walker testified that he selected Acosta's photo in the lineup because he "resemble[d]" one of the armed robbers, but after seeing Acosta in court Walker was "99 percent" sure of his identification. Taylor and Washington also identified Cesar S. as the third robber.

III.    *Gang Evidence*

On November 10, 2016, police executed a search warrant at Gordon's residence. Police found a cell phone and several items of Green Bay Packers clothing, including caps. The cell phone contained texts, photos and videos. Police also discovered a series

of texts between Gordon and Acosta on September 12, the day before the robbery, in which Acosta said he needed "a dirty thing." Gordon responded, "a toy." Acosta replied, "Yup, the cheapest one you can get." A gang expert later testified that when gang members use the word "toy," they are generally referring to a firearm.

At trial, the prosecution offered two gang-related videos of Gordon. One video was taken by a courthouse security camera on April 25, 2017. It showed Gordon drawing gang graffiti on the walls of a holding cell. According to Detective Albert Arevalo, a gang expert, the graffiti referred to both the Gardena 13 gang and to its rival, the South Los gang.

The second video came from Gordon's cell phone. In this video (the Blackie video), Gordon stated: "Hey. . . this that fool Blackie from the Gardena Gang nigga. Fuck all our enemies! Fuck Shoelace! Fuck Tuna Fishes! Fuck French Fries nigga! Fuck seven O's nigga! Fuck all your dead homies nigga! We out of here fool. Where you fools at homie?" Officer Jason Hooker, a gang expert, testified "Shoelace" is a disrespectful term for South Los gang members. "Tuna Fishes" is a disrespectful name for the Tortilla Flats gang, a rival of Gardena 13. "French Fries" referred to the Compton 155 gang and "Seven 0" referred to the Compton 70th Street gang. "Fuck all their dead homies" was one of the worst insults a gang member could direct at a rival gang.

The People also introduced cell phone photographs showing Gordon and friends. Gordon is wearing Green Bay Packers apparel, holding a handgun, making hand signs disrespecting South Los or making hand signs for Gardena 13. Gang expert Hooker viewed one of the photos from Gordon's cell phone and testified the men in that photo were Gordon, Acosta and Cesar S.

Acosta was making a hand sign and wearing a Green Bay Packers cap. Officer Hooker opined Acosta's hand sign was a "G" for Gardena 13.

Officer Hooker opined Gardena 13 gang members often wear Green Bay Packers clothing. In his opinion, appellants Gordon and Acosta were members of Gardena 13. Officer Hooker testified Gardena 13's primary activities included theft, robbery, carjacking and murder.

Detective Albert Arevalo testified that the South Los gang claimed as its territory the area bounded by Imperial Highway, El Segundo Boulevard, Normandie Avenue and Vermont Avenue. The scene of the crimes in this case was in South Los territory. Detective Arevalo testified South Los was a rival of Gardena 13 and during September 2016, when the crimes here were committed, the rivalry between the two gangs was "heated."

Officer Hooker opined that a carjacking and robbery committed by Gardena 13 gang members in South Los territory would be for the benefit of the Gardena 13 gang, even if South Los gang members were not targeted and the Gardena 13 gang members did not identify themselves as such during the crimes.

IV.  *The Defense*

Appellant Gordon did not testify and did not present evidence in his own defense.

Appellant Acosta testified. He denied participating in the robbery, attempted robberies, and carjacking. He stated he was home with his younger brothers that evening and then went to the house of a friend, Jesus Moran.

Acosta also denied being a member of the Gardena 13 gang. He wore Green Bay Packers clothing because he was a fan of the team. He spent time with friends from school who were gang members, but did not remember forming gang signs with them. Acosta acknowledged he, Gordon, and Cesar S. were friends. He asked his friend Gordon for a gun because he lived in a dangerous area and wanted to have peace of mind.

Acosta's friend Jesus Moran testified on Acosta's behalf. Moran brought screenshots of his September 13, 2016, Facebook messenger communications with Acosta. The screenshots show Acosta sent Moran a message at 7:11 p.m. Acosta then called Moran at 7:13 p.m. and 7:15 p.m. but Moran did not answer. Moran called Acosta at 7:16 p.m., but Acosta did not answer. They talked shortly after that and Acosta arrived at Moran's house at 7:28 p.m.

Russell Anamizu also testified on Acosta's behalf. Since childhood, Acosta had been a student at Anamizu's martial arts dojo. They had a close relationship and Anamizu would be surprised if Acosta were a Gardena 13 gang member.

V.    *The Additional Count Against Gordon*

Gordon was also charged in this case with the attempted premeditated murder of Julio Cornelio on October 19, 2016, a different date than the carjacking and robberies. It was alleged Gordon committed the offense for the benefit of a criminal street gang within the meaning of section 186.22. Cornelio was a South Los gang member and the attempted murder took place in the heart of South Los territory. The jury found Gordon not guilty of this charge.

**DISCUSSION**

I. *The True Finding on the Gang Enhancement Must be Reversed.*

On January 1, 2022, Assembly Bill 333 became effective. It amended several key provisions of section 186.22. The parties agree that the substantive changes in section 186.22 apply to appellants' cases which are not yet final on appeal. We agree as well. (*In re Estrada* (1965) 63 Cal.2d 740, 748 [statutory changes that reduce the punishment for a crime apply retroactively to all judgments not yet final on the statute's effective date]; *People v. Nasalga* (1996) 12 Cal.4th 784, 792 [*Estrada* applies to penalty enhancements]; *People v. Vinson* (2011) 193 Cal.App.4th 1190, 1197 [amendment increasing number of prior convictions for felony theft sentencing retroactive; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 69–71 [amendment raising threshold for drug enhancement is retroactive].)

Gordon contends the true findings on the section 186.22 gang enhancement must be reversed for three reasons: 1) the predicate offenses are no longer sufficient to prove a pattern of criminal activity because the record does not show they "commonly benefited a criminal street gang"; 2) the evidence does not show that appellants committed the current offenses with the specific intent to provide a common benefit to members where the common benefit is more than reputational"; and 3) there is no evidence that Gardena 13 had an organizational structure or hierarchy, even in an informal sense. Acosta joins in these contentions. We agree the true findings must be reversed. We remand to permit the People to retry the enhancements if they choose to do so. (*People v. Eagle* (2016) 246 Cal.App.4th 275, 280.)

11

A. <u>There is insufficient evidence of a pattern of criminal activity.</u>

Subdivision (e)(1) of section 186.22, as amended by Assembly Bill 333, provides: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years *of the prior* offense *and within three years of the date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more *members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational.*" (Italics added.)

The People introduced three convictions to prove Gardena 13 engaged in a "pattern of criminal gang activity" as required by section 186.22, subdivision (e)(1): 1) a conviction for a 2016 robbery with an admission of a section 186.22 gang enhancement allegation; 2) a conviction for a 2014 assault by means of force likely to cause great bodily injury; and 3) a conviction for a 2012 attempted murder, with a true finding on a section 186.22 gang enhancement allegation. Officer Hooker testified that in each of three cases the defendant was a member of the Gardena 13 gang.

Gordon contends that these convictions are no longer sufficient to prove a pattern of criminal gang activity under the amended version of section 186.22, subdivision (e)(1) because the evidence does not show they commonly benefited a gang as required by the amended statute. Acosta joins.

12

As amended, subdivision (e)(1) of section 186.22 requires that the predicate offenses "commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." Although there is evidence the 2014 offense was committed by a Gardena 13 gang member, there is nothing in the record to show that this offense benefited Gardena 13 in any way. There is no indication in the record or briefing that a gang enhancement was admitted or found true in that case. It should go without saying that not all offenses committed by a gang member are committed for the benefit of the gang, but if it needs saying, the record shows that Officer Hooker acknowledged this indisputable fact.

Since the 2014 conviction does not qualify as a predicate offense within the meaning of subdivision (e)(1) of section 186.22, that leaves only the 2016 offense and the 2012 offense. Assuming for the sake of argument that the admission of and true finding on the gang enhancements in those cases are sufficient to show a gang benefit, the 2012 offense does not qualify as a predicate offense because it occurred four years before the 2016 offense. Section 186.22, subdivision (e)(1) requires that "the last of those offenses occurred within three years of the prior offense."

B.    There is no evidence of gang organization.

There is also merit to appellants' claim that the finding must be reversed because there is no evidence the gang was an organized association, as required by amended subdivision (f) of section 186.22, which now defines a criminal street gang in pertinent part as "an ongoing, *organized* association or group of three or more persons." (Italics added.) Officer Hooker made no mention of any organizational structure or hierarchy of any kind in Gardena 13. He did not, for example, mention shot callers or

13

OG's, as is common in gang cases.  (See, e.g. *People v. Chhoun* (2021) 11 Cal.5th 1, 12, fn. 3 ["The term 'O.G.,' which stands for 'original gangster,' is generally used as a term of respect for older or veteran gang members. . . . O.G.s typically advise younger members how to plan and carry out crimes, and how to evade detection.  A 'shot caller' is a respected gang member who plans how a specific crime will be committed."]; *People ex rel. Reisig v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1513 ["The Broderick Boys has a hierarchical structure.  The 'foot soldiers' are typically younger men and women. . . . [O]lder members, up to mid–30's in age, are 'veteranos' who generally have families and are no longer on the street, but 'they're kind of controlling and watching over things in the shadows. . . . [T]hey've earned the right to lean back and to supervise.'  'The top guys that make the major decisions, all the way up, they are . . . your shot callers.' "]

The People's only response to this lack of evidence is to argue that the size of the gang and the fact that its members acted "in concert to increase their gang influence and territory indicates that the gang has some organized structure."  The record does not show the number of currently active gang members, only the number of "documented" gang members.  Thus, the number of gang members who are supposedly acting in concert to commit offenses to increase the gang's influence and territory is not included in the record on appeal.  Further, Officer Hooker did not testify that gang members acted "in concert."  He testified only that the gang committed a wide variety of crimes, both minor and major, to "establish" or "claim" their territory.  At most his testimony shows that members of the gang "collectively engage in, or have engaged in, a pattern of criminal gang

14

activity," as required by subdivision (f) of section 186.22 even before the Assembly Bill 333 amendments.

Further, what the People are proposing is an inference from circumstantial evidence. Appellants are entitled to a jury determination of whether that is a reasonable inference and whether there are other reasonable inferences which can logically be drawn from Officer Hooker's evidence. A jury, for example, might conclude that it is reasonable to infer that the wide variety of crimes described by Officer Hooker, although undertaken with a common purpose, were committed by gang members in response to individual circumstances, such as when opportunities presented themselves (as in this case) or when required (witness intimidation), and not as the result of an organized plan or directions from others above them in a hierarchy.

C. <u>There is no substantial evidence appellants intended to provide more than reputational benefit to their gang</u>.

Amended section 186.22, subdivision (g) requires proof a defendant committed the charged crime with "the specific intent to promote, further, or assist in criminal conduct by gang members" (§186.22, subd. (b)(1)), which amended subdivision (g), provides that the common benefit to the gang must be "more than reputational." Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

Appellants contend there is no substantial evidence that they committed the robbery and carjacking with the intent to provide a benefit to the gang that was more than reputational.

15

The stolen car was found abandoned two weeks after the carjacking, and Officer Hooker had no information that the car was used to commit any crimes. Although Officer Hooker testified generally that gang members commit robberies to provide funds to the gang, he had no information about how the money taken in this robbery was used. Officer Hooker testified that the crimes would "instill[] fear and intimidation in the community," but in the absence of a targeted witness or informant, this is a reputational benefit. The prosecutor asked whether committing the crimes in rival territory can "be an act to try to claim that territory and take it from them?" Officer Hooker replied: "It could be." This is speculative. Thus, the lack of substantial evidence of a benefit to the gang is an additional reason to reverse the enhancement.

II.     *Appellants Have Not Shown Prejudice From CALCRIM No. 315.*

In *Lemcke*, the California Supreme Court held: "Although CALCRIM No. 315's instruction on witness certainty did not violate Rudd's due process rights [citation], we now join other jurisdictions (and the California Commission on the Fair Administration of Justice) in acknowledging that this form of instruction has the potential to mislead jurors. There is near unanimity in the empirical research that ' " under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' [Citations]" (*Lemcke, supra,* 11 Cal.5th at p. 665.) At the same time, the Supreme Court noted: "While there is general agreement that witness certainty is not a good indicator of accuracy under most circumstances, that 'does not mean that eyewitness certainty is never correlated with accuracy.' [Citation.] Rather, as Justice

16

Liu explained in his concurring opinion in [*People v. Sánchez* (2016)] 63 Cal.4th 411, the research suggests that ' " the strength of the confidence-accuracy relationship varies, as it depends on complex interactions among [numerous] factors." ' " (*Lemcke,* at pp. 666–667.) The Supreme Court elected to direct trial courts to delete the certainty factor from CALCRIM No. 315, and referred the matter to the Judicial Council for further consideration. (*Id.* at pp. 668–669.)

Acosta acknowledges that the Supreme Court in *Lemcke* found CALCRIM No. 315 did not violate Rudd's due process rights. He contends, however, that giving CALCRIM No. 315 in this case did render his trial unfair and violate his due process rights under the California and United States Constitutions because, unlike in *Lemcke*, no other instruction or evidence introduced at trial cured the misconception. Gordon makes essentially the same argument, but acknowledges there is no evidence to counteract the instruction because appellants did not call an eyewitness expert. He contends the existing record is sufficient to show prejudice, but if not, it was ineffective assistance of counsel to fail to call such a witness.

A. CALCRIM No. 315 did not violate appellants' due process rights.

The due process claim in *Lemcke* was predicated on two theories: 1) it lowered the prosecution's burden of proof, and 2) it denied the defendant a meaningful opportunity to present a defense. We do not agree with appellants that the presence of expert testimony was a determinative factor in the *Lemcke* court's rejection of either theory.

In rejecting the burden of proof argument, the Supreme Court acknowledged the presence of expert testimony in the case

17

before it, but relied heavily on its past decision and on the reasoning of a U.S. Supreme Court case. The Supreme Court noted that it had previously found "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke, supra,* 11 Cal.5th at p. 657.) The Supreme Court then turned to federal law, specifically, *Cupp v. Naughten* (1973) 414 U.S. 141, 149 (*Cupp*). The Supreme Court noted that the eyewitness "instruction in *Cupp* was found not to violate due process despite having effectively directed the jury that the prosecution's eyewitnesses were presumed to speak the truth." (*Lemcke,* at p. 659.) CALCRIM No. 315, of course, does not make as strong a statement as that.

With respect to the second argument, the Supreme Court found no denial of the opportunity to prevent a defense because the defendant "was permitted to put on a vigorous defense on the issue of identity." (*Lemcke, supra,* 11 Cal.5th at p. 660.) The same is true here. Appellants do not identify any restrictions on their defense presentation on the issue of identity. It is true that part of the defense in *Lemcke* was an eyewitness expert, but nothing prevented appellants from calling such a witness as part of their defense. Thus, we treat the error in giving CALCRIM

18

No. 315 as one of state law only, and we evaluate it under the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818.

B.      The record on appeal does not show prejudice.

Gordon contends CALCRIM No. 315 was prejudicial. Because there was no evidence apart from the victims' identification that linked appellants to the crime, the prosecutor "urged jurors to convict the defendants based on the eyewitnesses' confidence they were 'positive' about 'identification[s]' " and suggests the prosecutor "exploit[ed] an erroneous instruction during argument to the jury." Acosta contends CALCRIM No. 315 was prejudicial because "the prosecutor knew the most compelling evidence showing the accuracy of the eyewitnesses' identification was their certainty and focused the jury on that certainty to argue their identifications were accurate." He argues the prosecutor "capitalized on [the common misperception that certainty equals accuracy] during closing argument." Both appellants conclude it is reasonably probable they would have received a more favorable result in the absence of CALCRIM No. 315, or put differently, that CALCRIM No. 315 led the jury to convict them.

These are not accurate descriptions of the prosecutor's statements during closing argument. The prosecutor mentioned the witnesses being "positive" about their identifications only briefly, did not refer to or quote from CALCRIM 315's "How certain was the witness when he or she made an identification?" factor, and did not expressly argue that being positive (or certain) correlates with accuracy. He briefly stated that Taylor identified appellants in the photographic lineup and again in court and "he's positive in his identification." With regard to Walker, the

19

prosecutor stated only that Walker "identifies Acosta and Cesar S." in the photo book and "[h]e identifies all here for you in court." The prosecutor did note that Walker was "positive" in his identification of Gordon in court, but this was made in the context of Walker having failed to identify Gordon in the photo book. With regard to Washington, the prosecutor noted that "he's positive in his identification."

During his discussion of the identifications, the prosecutor more directly relied on the fact that all three witnesses identified the same two men. When first describing the offenses, the prosecutor acknowledged that the two witnesses to the carjacking gave conflicting testimony about which defendant got into the car with Cesar S., and noted that this was the only inconsistency in the testimony, which was otherwise "entirely consistent." Then in describing the identification process using photo books, he pointed out that "all the books were in different orders . . . so that way when they're passing each other by, there's no hints. . . . They want each victim to make up their own mind, and they do." After describing each victim's response to the books, the prosecutor emphasized that "all three victims" identified Acosta in the books and "two of the victims" identified Gordon in the books and "all three in court."

The prosecutor concluded his discussion of identification by reminding jurors that if the independent and unanimous identifications were not enough, there was corroborating evidence. He pointed to a gang motive, which had already been discussed, including Acosta's request to Gordon for a gun the day before the armed crimes in this case took place. The prosecutor also reminded the jury that the car had been recovered in

20

Gardena 13 territory. He concluded by stating: "all the evidence only points to the defendants."

Thus, on the limited record on appeal, we cannot say a more favorable result was reasonably probable for appellants in the absence of CALCRIM No. 315 or that CALCRIM No. 315 led the jury to convict appellants. We find the fact that 1) all three witnesses independently identified Acosta from the photo book and two identified Gordon; 2) Gordon and Acosta were friends who had discussed Acosta's acquisition of a gun a day before the armed offenses occurred; and 3) Gordon and Acosta were members of Gardena 13 were all significant pieces of corroborating evidence, and together were more likely to have influenced the jury than the witnesses' subjective belief about the identifications they made.[2] Further, the jury was aware that two of the three victims had made at least one error in identification. Either Taylor or Washington was wrong about which defendant got into the car with Cesar S. Walker failed to identity Gordon in the photo book. Thus, the witnesses themselves demonstrated that their certainty did not mean they were always accurate.

C.    Gordon has not shown ineffective assistance of counsel.

Gordon contends his conviction must still be reversed because his counsel was ineffective in failing to call an expert witness on eyewitness identification. If Gordon's counsel was deficient in failing to call such an expert, we do not find this

---

[2]    We recognize that all the men in the photo book were Gardena 13 gang members, which would tend to corroborate any selection made by the victims, and so we do not give this fact heavy weight.

21

deficient performance prejudicial on the record before us, however, because there is no expert testimony at all in the record. As to Gordon's claim, the Supreme Court was clear in *Lemcke* that "[w]hile there is general agreement that witness certainty is not a good indicator of accuracy under most circumstances, that 'does not mean that eyewitness certainty is never correlated with accuracy.' [Citation.] Rather, as Justice Liu explained in his concurring opinion in [*People v. Sánchez, supra,*] 63 Cal.4th 411, the research suggests that ' "the strength of the confidence-accuracy relationship varies, as it depends on complex interactions among [numerous] factors." ' " (*Lemcke, supra,* 11 Cal.5th at pp. 666–667.) Because there was no expert testimony in this case, we cannot evaluate whether this is a case where certainty is correlated with accuracy, or assess the strength of any such relationship.

We cannot simply guess what an eyewitness expert would have said about certainty under the circumstances of this case. To give just one example, the expert witness in *Lemcke* opined, in the words of the Supreme Court, that "the only time certainty may be useful in assessing accuracy is when the identification is made in close temporal proximity to the event and law enforcement has utilized nonsuggestive procedures." (*Lemcke, supra*, 11 Cal.5th at p. 658.) Here, the identifications did not take place until about two months after the offenses were committed. But, as the *Lemcke* court recognized, there is a great deal of nuance to the requirement for temporal proximity. For example, the expert in *Lemcke* explained that "an expression of certainty is only useful when the identification is made soon after the event because, as the investigation progresses, a witness will normally receive additional information that can unconsciously

22

bolster his or her confidence." (*Id.* at p. 651.) Assuming for the sake of argument that an expert would have given similar testimony in this case, we cannot simply imagine whether the expert would find that such additional information was received in this case, or to what extent any information would have bolstered the witnesses' confidence.

III.  *The Trial Court Did Not Abuse Its Discretion When It Admitted the Blackie Video to Show Gang Motive and Intent.*

Gordon contends the trial court abused its discretion in admitting the "Blackie" video taken from his cell phone. He contends the inflammatory quality of the video outweighed its probative value. He further contends admission of the video amounted to a deprivation of his federal constitutional right to due process and a fair trial. We see no abuse of discretion and no undue prejudice to Gordon. We note, however, that if the People are unable to prove the gang allegation on remand, this evidence will have far less probative value and Gordon may raise this claim again in light of this change in circumstances. He must, of course, still show prejudice.

A.  A trial court has discretion under Evidence Code section 352 to weigh the probative value of evidence against its potential for undue prejudice.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

23

A trial court's decision under Evidence Code section 352 will not be disturbed on appeal unless the court exercised its discretion in " 'an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, abrogated on other grounds recognized by *People v. Leon* (2020) 8 Cal.5th 831, 848.)

### B. The trial court ruled on the admissibility of the cell phone contents as a whole.

The People sought to introduce the video to show defendant's "motive when it comes to South Los gang and his solidarity with his gang." They contended the video clearly showed Gordon's intent relevant to the attempted murder count. The People also argued it was relevant to show Gordon's and the gang's intent as Gordon was "leading known [gang] associates, Mr. Acosta and Cesar S., into that carjacking[.]"

For the pre-trial hearing, the parties marked the cell phone contents and records, including the "Blackie" video, as Court's Exhibit 1. The trial court ruled: "The objection as to court's Exhibit 1 in its entirety is noted for the record. It's overruled. [¶] I believe that the prejudice that may be occurring as a result of those is far outweighed by the probative value of dealing with not only the firearms allegations but also the gang allegations and intent, motive, common plan, or scheme, access to [the] firearm itself."

24

C.    The trial court did not abuse its discretion in finding the potential for prejudice was outweighed by the probative value of the video to show Gordon's gang motive and intent.

It is well established that evidence of a defendant's gang affiliation can be relevant to prove the defendant's motive and intent. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Here, Gordon was not simply expressing his personal feelings about certain gangs, he was expressing his feelings as a gang member about rivals of his gang -- and was doing so in a disrespectful way. Gordon's attitude was relevant to establish his motive for or intent in committing subsequent crimes which disrespected a rival gang. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 [evidence of defendant's threat against a member of a rival gang which contained a "gang-land" reference was relevant and admissible to show defendant's assault was "evidently not the product of a personal grievance but of [the] larger social evil" of prison gangs.].) Further, Gordon's remarks showed the strength of his commitment to his gang, which is relevant where, as here, a defendant argues at trial the alleged crimes were committed for personal reasons with friends. (See *People v. Albillar* (2010) 51 Cal.4th 47, 62–63 [prominent gang tattoos on defendants and abundant gang paraphernalia in defendants' apartment relevant to show strength of defendants' commitment to gang and to support inference defendants' offenses were gang-related].)[3]

_____

[3]    Although the video containing gang evidence in this case was about a year old, the video was not so remote in time as to lose its probative value. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1213–1214 [threatening statement made one and a-half years

It is also well established that even profanity-laden statements may be more probative than prejudicial. (See, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1044–1045 [tape-recorded jail conversations].) "Jurors today are not likely to be shocked by offensive language." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1009.) Further, the "unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not . . . unusual." (*People v. Quartermain* (1997) 16 Cal.4th 600, 628.)

Neither has Gordon shown undue prejudice. Here the jury unequivocally demonstrated that it was not biased against Gordon by the admission of the video. Gordon alone was charged with an attempted murder with the allegation that the murder was gang-related. The evidence on that charge was weaker than on the other charges. The victim refused to testify and the testimony of the only eyewitness was weak. Despite the video, the jury acquitted Gordon of that charge.

The evidence on the carjacking and robbery charges was considerably stronger, increasing the difficulty of showing undue prejudice. The victims had a good opportunity to view Gordon; identified Gordon in a photographic lineup or at trial or both; stated that at least one of the robbers was wearing clothing associated with Gardena 13, of which Gordon was a member; and all three victims testified at trial. Evidence from Gordon's cell phone linked him to Acosta and Cesar S., both of whom were

_____

before crimes not too remote to be probative].) "[W]hether the statements reflected merely a transitory state of mind, as opposed to something more [enduring], was a question for the jury to decide." (*Id*. at p. 1214.)

identified by the victims as two of the robbers.  Thus, there is no reasonable probability or possibility that the video contributed to the guilty verdicts against Gordon or that he would have received a more favorable outcome at trial in the absence of the video. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)[4]

The trial court's ruling that the probative value of the video outweighed its inflammatory potential was not arbitrary or capricious and the trial court did not abuse its discretion.

> D.  <u>The trial court did not admit the video for any purpose other than to show Gordon's gang motive and intent.</u>

Gordon argues that even if the video were properly admitted to show gang motive and intent, the trial court admitted the evidence for an additional, improper use.  He claims the trial court's use of the phrase "common plan or scheme" is a reference to Evidence Code section 1101 and shows the court erroneously admitted the video as an instance of prior conduct under that section to prove defendants committed the charged acts.  Gordon reads too much into this phrase, which is not used

---

[4]  The application of ordinary rules of evidence like section 352 does not normally implicate the federal Constitution.  (*People v. Marks* (2003) 31 Cal.4th 197, 227.)  We do not agree with Gordon that the improper admission of the video violated his federal constitutional rights to due process and a fair trial, and if we found error, we would find it harmless under the beyond a reasonable doubt standard applied to such violations.  (*Chapman v. California, supra,* 386 U.S. at p. 24.)

in section 1101.[5]  Further, the trial court made no reference to section 1101 in its ruling and later instructed the jury, limiting its use of the video to the gang allegations.

Gordon also claims the trial court accepted the People's proffer that the video showed Acosta's intent and erroneously admitted the video for that purpose.  The record does not support either part of this claim.  The prosecutor argued that Acosta was following Gordon's lead, but then asked, "But what is Mr. Gordon's intent[?]"  The prosecutor cannot reasonably be understood as arguing that the video is direct evidence of Acosta's intent to commit the substantive crime.  The trial court made no refence to Acosta in its ruling, and did not use the words "follow" or "lead."

IV.    *Acosta Has Not Shown His Counsel Was Constitutionally Ineffective In Failing to Challenge the Photographic Lineup As Suggestive.*

The photographic book lineup used by police in this case contained 18 photos.  Thirteen were head shots, and three were full body shots.  Only one photo, a full body shot, contained two people; the two were Acosta and Cesar S.  Cesar S. was also shown in a head shot elsewhere in the book.  Acosta contends the photographic "book" line-up used by police was unduly suggestive and trial counsel's failure to challenge the photographic line-ups and subsequent in-court identifications by the victims constituted ineffective assistance of counsel.

---

[5]    The phrase is used in case law discussing Evidence Code section 1101.  (See, e.g., *People v. Ewoldt* (1994) 7 Cal.4th 380.)

28

An appellant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) To establish such a claim, the appellant must show that counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) " ' "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ' " (*People v. Thomas* (1992) 2 Cal.4th 489, 530-531.)

When an appellant raises on appeal a claim of ineffective assistance of counsel, we look to see if the record contains any explanation for the challenged aspects of the representation. If the record is silent, then the contention must be rejected " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Haskett* (1990) 52 Cal.3d 210, 248.)

Here, there is evidence in the record indicating Acosta's counsel failed to challenge the line-up on the ground it was unduly suggestive because the defense theory was that the victims were framing Acosta. Counsel's comments suggest he believed an inadvertent misidentification due to a suggestive lineup would have been inconsistent with the theory of deliberate misidentification.

During the hearing on the motions in limine, Acosta's counsel explained Acosta would be offering an alibi defense and it was Acosta's position that when the victims of the carjacking and their gang failed to shoot Mr. Acosta sometime after the carjacking, the victims decided to identify him at the lineup. The trial court agreed to allow the defense to impeach one of the victims with prior felony convictions and an arrest for assault with a deadly weapon "given the offer of proof that this isn't just a question of mistaken identification, but it's an alleged fabrication. Therefore the witness' credibility is pivotal."

During Acosta's counsel's opening statement, counsel stated: "Basically, what we have in this case, is three dates: September 13th, 2016, October 28th, 2016, and November 2nd, 2016." He explained, "Now on October 28th, Mr. Acosta was the victim of a shooting by the South Los gang, somebody in that gang, people in that gang. [¶] Now, on September 13th, the alleged hijacking occurred. [¶] And on November 2nd, [now] two months later, the alleged victims of the carjack identify Mr. Acosta. Now that's two months later. They pick out Mr. Acosta and not hesitating, not waiting to go through the book and study it, right away they picked out Mr. Acosta, who was the victim . . . of this shooting." Counsel stated that he would present evidence that Acosta had an alibi for the time of the crimes and could not have committed them. Counsel concluded his opening statement by saying, "What the motive of the three alleged victims are in picking [Acosta] out, we'll leave to you to decide. We're going to reserve that for final argument."

Counsel's attempts to elicit testimony from the victims that they were or had been members of a gang were unavailing, as were questions to Taylor about his awareness of whether his

30

Mercedes was parked in gang territory and whether he had ever seen Acosta before the carjacking. In short, the defense failed spectacularly.

By closing argument, having apparently decided that he had not shown that the victims framed Acosta, and that the jury would view the victims as honest, counsel shifted focus to the suggestive nature of the lineup. By that point, it was too late to challenge the witnesses' identifications as tainted. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 989 [defendant's due process challenge to photographic lineup, first raised as part of motion for judgment of acquittal, was untimely and thus issue was waived].) Prudently counsel did not completely abandon his earlier argument, and continued to point to the unusual rapidity of the victims' identification of Acosta.

Generally, we " 'accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' [Citation.] 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

Evaluating the decision on the record on appeal, it is clear counsel believed there was evidence that the victims had some gang relationship which would cause them to cooperate in framing Acosta. Gordon argued a framing defense to the attempted murder charge with scant evidence and was acquitted. Thus, on the record before us, we cannot say that his decision to advance a framing defense was unreasonable. While inadvertent misidentification of a suspect appears to be incompatible with deliberate misidentification of a suspect, *Lemcke* shows the

31

importance of an eyewitness expert in challenging identifications and there is nothing in the record to show that Acosta's counsel consulted with such a witness. Nothing in this opinion should be read as precluding Acosta from raising a claim of ineffective assistance of counsel based on the lack of an expert witness, should evidence exist that such an expert could raise suggestiveness without contradicting the framing theory.

V. *Carjacking May Be the Natural and Probable Consequence of a Robbery and the Trial Court's Instruction to That Effect Was Not Legally Erroneous.*

Appellants contend the trial court erred in instructing the jury on the "legally erroneous" theory that carjacking may be a natural and probable consequence of robbery and attempted robbery. Appellants do not cite authority holding that carjacking cannot be a natural and probable consequence of robbery or attempted robbery and we are not aware of any such authority.

Acosta relies on *People v. Prettyman* (1996) 14 Cal.4th 248 for the general proposition that an aider and abettor cannot be liable for "a very serious crime" under the natural and probable consequences doctrine when the target offense was "trivial." Moreover, he argues there must be a "close connection" between the two crimes. (*Id.* at p. 277.)[6] Acosta contends there is not a close connection between robbery and carjacking, and that robbery of a small amount of money is "too trivial" to make the offense of carjacking foreseeable.

---

[6]     *Prettyman* involved assault and murder.

32

We reject the argument that robbery is trivial. We find robbery and carjacking are closely connected offenses. Both are forms of taking property from a person using force or fear. Robbery may, as appellants contend, be a less serious crime than carjacking, but robbery is not a trivial offense. The seriousness of a robbery is not, as Acosta implies, reduced by the failure of the robber to obtain large amounts of cash or valuables.

Gordon relies on *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*) to argue that carjacking was a "collateral" offense to robbery and so cannot be the natural and probable consequence of a robbery. The Court of Appeal in *Leon* held witness intimidation was not the natural and probable consequence of the crimes of auto burglary and illegal possession of a weapon because the crime of witness intimidation was not closely connected to either of those crimes and was not foreseeable under all the circumstances surrounding the target crimes. (*Id.* at pp.153, 160–161.) *Leon* involves a different set of crimes and surrounding circumstances. It has no application to the crimes and circumstances in the present case.

" '[A]lthough variations in phrasing are found in decisions addressing the doctrine—"probable and natural," "natural and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability.' [Citation.] Thus, ' "[a] natural and probable consequence is a foreseeable consequence" . . . .' (*Ibid.*) But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the

individual case (*ibid.*) and is a factual issue to be resolved by the jury." (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

This is especially the case with robbery, "a crime that can be committed in widely varying circumstances. It can be committed in a public place, such as on a street or in a market, or it can be committed in a place of isolation, such as in the victim's home. It can be committed in an instant, such as in a forcible purse snatching, or it can be committed over a prolonged period of time in which the victim is held hostage." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532.) The setting of the robbery plays a role in determining whether additional crimes are foreseeable. For example, " '[r]apes consummated during the robbery of a bank or supermarket appear to be a rarity, but rapes in the course of a residential robbery occur with depressing frequency.' " (*Id.* at p. 533.)

We hold that the offense of carjacking may be a natural and probable consequence of the offense of robbery. Whether a particular carjacking is in fact a natural and probable consequence of a particular robbery is a question for the jury to decide under the facts of the case before it.

Here, a reasonable jury could find that carjacking was a foreseeable consequence of robbery. Appellants and Cesar S. approached three men standing around an expensive car and directed them to empty their pockets. The total amount of money recovered was about $140-$160. A jury could find that it was foreseeable that one or more of the men would seek to take more valuable property and look to the car. Appellants contend the carjacking was a result of the car starting up on its own, which was not foreseeable. The spontaneous start-up may have prompted the carjacking, or it may have simply facilitated it.

34

Cesar S. apparently moved to the driver's side of the car just before the car started and he could have done so with the pre-existing plan of taking the car, making the car's start up a fortunate coincidence for him. Cesar S. might also have moved to the driver's side of the car for another reason and only decided to take the car when it self-started. This was an issue for the jury to decide.

VI. *There Is Sufficient Evidence to Prove Cesar S. Aided and Abetted the Robberies Before Perpetrating the Carjacking, Which Was Sufficient Evidence to Support the Natural and Probable Consequences Instruction.*

Appellants contend the natural and probable consequences instruction was factually erroneous as well as legally erroneous. In order for the natural and probable consequences doctrine to apply, a coparticipant in the robberies (the target offenses) must have committed the carjacking. Appellants contend Cesar S. was the perpetrator of the carjacking but there was no evidence that he aided and abetted the robberies. We find sufficient evidence of aiding and abetting by Cesar S.

"[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*).)

35

Here, Cesar S. came to the scene with appellants, and all three men were dropped off very near the Mercedes. Together they walked straight toward the victims. (See *Campbell*, *supra*, 25 Cal.App.4th 402 at p. 409 [defendant "did not independently happen by the scene of the crime." He had walked by victims with his companion and then decided with the companion to return to victims; they approached the victims together and "[t]heir concerted action reasonably implies a common purpose."].) There was ample evidence of a long-standing relationship among the three men which predated their arrival at the scene: all three men was members of the Gardena 13 gang and at least one was wearing gang clothing. They got out of the car in the territory of a rival gang. A jury could reasonably infer Cesar S. did not believe their common purpose was a social outing.

When Gordon and Acosta pulled out guns and approached the victims, Cesar S. did not remonstrate with them or walk away. Cesar S. positioned himself slightly back from the group, where he could see but not be seen. He remained with Gordon and Acosta throughout the robberies. (See *Campbell*, *supra*, 25 Cal.App.4th at p. 409 [defendant's lack of surprise or fear when companion pulled out a gun and announced it was a robbery and his act of staying with his companion thereafter is evidence supporting a finding of aiding and abetting].) Although Cesar S. began the process of fleeing the scene when he got into the Mercedes, he waited for one of the other men to get into the car before he drove off, indicating more concerted action. (See *People v. Luna* (1956) 140 Cal.App.2d 662, 665 [defendant's subsequent participation in fight with one person indicated he was not innocent bystander when codefendant started fight with another person].)

Taken as a whole, the evidence in this case is more than sufficient to show Cesar S. aided and abetted the robberies. (See e.g., *People v. Mitchell* (1986) 183 Cal.App.3d 325, 330 [Evidence of aiding and abetting was sufficient where defendant was present before, during and after the crime. "He was in the company of the perpetrators of the crime engaged in conversation with them at the entrance to the escalator only seconds before the robbery plan was put in operation, and entered the escalator with them; he remained in their company during the robbery having positioned himself on the escalator in such a way as to protect them during the taking and facilitate their escape; and immediately after the taking, fled with them to his car in a nearby parking lot."]; *People v. Carlson* (1960) 177 Cal.App.2d 201, 202–203 [Evidence was sufficient to show aiding and abetting where defendant and two companions entered a liquor store. One of defendant's companions pulled out a gun and told the clerk to open the cash register. After the clerk complied, defendant's other companion forced the clerk at gunpoint into a back room. The clerk saw defendant and his companion, move forward in the direction of the cash register, but did not see what took place after that. He heard two men leave the store, and then the robber with the clerk left.].)

VII.   *Modifying CALCRIM No. 401 Was Not Argumentative or Otherwise Improper.*

Appellants contend the trial court's modification of CALCRIM No. 401 defining aiding and abetting was argumentative and improperly lightened the People's burden to prove guilt beyond a reasonable doubt, thereby violating

appellants' federal constitutional rights to due process and a fair trial.  We find no error.[7]

The trial court inserted the middle paragraph set out below, so that the modified instruction read in pertinent part:

> "Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

> **"Factors relevant to determining whether a person is an aider and abettor include:  presence at the scene of the crime, companionship, and conduct before or after the offense.**  (Boldface added.)

> "If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor."

---

[7] Respondent contends appellants have forfeited this claim on appeal by accepting the modified instruction.  We do not agree. (See *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13 [defendant did not forfeit claim by failing to object]; § 1259.)  Respondent's reliance on *People v. Lee* (2011) 51 Cal.4th 620 to show forfeiture is misplaced.  The defendant in *Lee* claimed error in the trial court's *failure* to sua sponte modify or amplify a correct standard jury instruction to include an expanded definition of consent based on the facts of that case.  Our Supreme Court found the trial court had no such duty.  (*Id*. at pp. 637–638.)

38

Our colleagues in the Third District Court of Appeal have considered a special instruction containing virtually the same list of factors that were added to the instruction in this case. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 84 (*Battle*) [Special instruction stated: " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, flight, and conduct before and after the offense.' "].) We agree with their conclusion that the listing of these particular factors is not argumentative and does not invade the province of the jury "because it merely list[s] factors." (*Id*. at p. 85.)

As the *Battle* court explained: " 'An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.]' [Citation.]) An argumentative instruction is ' " an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " [Citation.]' (*People v. Panah* (2005) 35 Cal.4th 395, 486 [25 Cal.Rptr.3d 672, 107 P.3d 790].) For example, in *People v. Panah,* the defense sought an instruction that stated: ' "There is evidence from which you may infer that the decedent was not alive at the time of the sodomy. This evidence includes the testimony of Dr. Heuser concerning the failure of the anal sphincter to constrict. [¶] If you find from the evidence that it was reasonably possible that decedent was dead at the time of the sodomy, you must find the special circumstance to be not true, even though there may be evidence that the deceased was alive. [¶] In order to find the special circumstance of sodomy to be true, you must find that the only reasonable interpretation of the evidence was that the deceased was alive,

39

and this must be proved beyond a reasonable doubt." ' (*Id.* at pp. 485–486.) The Supreme Court concluded that this instruction was properly rejected because it is argumentative." (*Battle supra*, 198 Cal.App.4th at p. 85.)

There are no specific items of evidence referenced in the trial court's addition to CALCRIM No. 401 in this case. There are only "generic factors" such as "conduct." (See *Battle*, *supra*, 198 Cal.App.4th at p. 85.) As appellants acknowledge, the factors listed are valid factors to consider in determining whether a defendant aided and abetted a crime. (*Ibid*.; see *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094–1095.) The jury was free to evaluate the evidence and determine whether defendants were aiders and abettors. (*Battle*, at p. 85.)

Acosta contends that the inclusion of the "companionship" factor was erroneous because this was a gang case, and the phrase created a risk that the jury would convict him of aiding and abetting solely on his companionship with two other gang members. Nothing in the modified instruction suggests that companionship alone is sufficient for aiding and abetting.

Acosta contends the People used the instruction to argue companionship alone was sufficient to show aiding and abetting when the prosecutor stated in closing argument: "There's aiding and abetting liability. Three Musketeers is a good reference; all for one, one for all." Acosta omits the next sentence of the prosecutor's argument: "This is a team sport." The prosecutor then explained the team concept: "One way of looking at aiding and abetting is say you look at a gang robbery with five guys. One guy's waiting in the car. *They all have a plan to rob the bank*. Four guys go in the bank. One guy puts the gun in the air, says, give us all your money or I'll shoot, and three guys who say

40

nothing get the money. They're all working together. *They all have their different parts of the plan.* None of them as you will see actually commit a robbery by themselves. *But through their conduct with each other, they work together to complete a robbery.*" (Italics added.)

The People's argument did not suggest companionship alone was sufficient for conviction, and nothing in the record suggested Acosta's only connection to the carjacking was his companionship with the others. Acosta was not simply hanging out with his companions when they unexpectedly decided to go on a crime spree. He was actively perpetrating a robbery with them when the carjacking began. There is evidence Cesar S. moved closer to the car, toward the driver's side, while the robbery was still ongoing, and one victim testified Acosta got into the Mercedes with Cesar S. as they fled. This is substantial evidence of direct aiding and abetting. The instruction did not lighten the People's burden of proof or tip the jury's consideration of the evidence in the People's favor.

VIII. *There Was No Prejudicial Cumulative Error in This Case.*

Appellants contend the cumulative effect of the claimed errors rendered their trial fundamentally unfair in violation of their constitutional rights to due process. There is no error to accumulate in this appeal. (*People v. Brents* (2012) 53 Cal.4th 599, 619 ["Because the trial court did not make multiple errors, defendant's claim of cumulative prejudice necessarily fails."].) Appellants have not revised or updated this claim on remand and so we do not reconsider it.

41

IX. *The Trial Court Did Not Err in Failing to Stay the Count 2 Robbery Conviction Pursuant to Section 654.*

Appellants contend the trial court erred in failing to stay their sentences for their count 2 conviction for the robbery of Taylor pursuant to section 654 because those convictions were based on the same act as the count 1 carjacking convictions. The record contains substantial evidence to support the trial court's implied determination that appellants harbored multiple intents or objectives.

A.  <u>Section 654 applies to a discrete physical act or a course of conduct involving only a single objective or intent.</u>

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or

multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.' " (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Whether a defendant harbored a single or multiple objectives during a course of criminal conduct is a factual question for the trial court. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) We review this determination for substantial evidence and presume in support of the court's conclusion the existence of every fact the court could reasonably have deduced from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

B.     The trial court impliedly found appellants had multiple objectives and intents.

The trial court explained its decision that section 654 did not apply as follows: "[T]he court does not find that under Penal Code section 654 that [the two offenses] in fact merge. I believe that by operation of law that the robbery as to Mr. Taylor was already completed before the carjacking of Mr. Taylor did occur. So I don't think as a matter of law that the court is required to stay it." The court found it appropriate to run the sentences for the count 1 carjacking and count 2 robbery concurrently rather than consecutively.

43

Appellants contend that the trial court erred in finding the robbery was complete "by operation of law" because the crime of robbery is not complete until the perpetrator reaches a place of temporary safety, and the scene of the robbery is not a place of temporary safety. (*People v. Harris* (1994) 9 Cal.4th 407, 421; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1375.) The trial court's use of the phrase "by operation of law" was perhaps unfortunate. The remainder of the court's statement indicates the court simply meant appellants had satisfied their objective of obtaining personal property from Taylor before turning their attention to the car. As the court stated more colloquially, "the victim had already been robbed." (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1208 [when trial court sentences defendant under section 654, a finding that the crimes were divisible is inherent in the record].) Thus, we find no error simply from the trial court's use of the phrase "by operation of law."

C. <u>Appellants' use of a firearm was not a "single physical act" for purposes of section 654.</u>

Acosta urges another ground for reversal: he claims that his use of a gun was a "single physical act" providing the force or fear for both the Taylor robbery and the carjacking. Acosta contends the reasoning of *Corpening* required the trial court to stay the sentence for the robbery conviction. The court in *Corpening* held that if "the same action complete[s] the actus reus for each of . . . two crimes" section 654 bars punishment for both crimes. (*Corpening, supra,* 2 Cal.5th at p. 309.) The use of a gun, however, does not "complete" the actus reus for either robbery or carjacking. As the court explained in *Corpening*, "the forceful taking of a vehicle on a particular occasion is a single physical act under section 654. The forceful taking of [the

44

victim's] van, and the rare coins contained therein, completed the actus reus for robbery—the felonious taking of another's personal property by force. Precisely the same action, not a separate but related one taken at a separate time or in a distinct fashion, was also the basis for the contention that the defendant completed the actus reus for carjacking—the felonious taking of another's motor vehicle by force." (*Corpening*, at pp. 313–314, fns. omitted.)

Here, Taylor's cash was not inside his Mercedes and so the taking of his car did not complete the actus reus of robbery. The robbery and carjacking involved two separate but related actions undertaken consecutively, not simultaneously, and in slightly different fashions. The robbery occurred when Gordon commanded Taylor to empty his pockets, and Taylor physically handed his cash to Acosta. After this transfer was complete, Cesar S. took advantage of the fear created by the robbery and got into the Mercedes and drove it away. Thus, this case does not involve a single physical action which completes the actus reus of two crimes. *Corpening* does not apply.

> D. <u>There is substantial evidence that appellants had different objectives and intent in committing the carjacking than they had in committing the robberies.</u>

Gordon contends that under any theory of the case, the carjacking was either concurrently intended with the robbery or an intended or foreseeable adjunct to the robbery. Gordon believes the jury necessarily chose one of those theories in finding Gordon guilty of carjacking and therefore implicitly found the carjacking and robbery were part of a single course of conduct pursuant to a single objective. Gordon argues that the trial court

45

was barred from finding otherwise under either a Sixth Amendment right to jury trial or principles of due process.[8]

Where a finding of a single objective is subsumed within the jury verdict "the trial court cannot countermand the jury and make the contrary finding" of multiple objectives. (*People v. Bradley* (2003) 111 Cal.App.4th 765, 770.) But where the jury has not made a specific finding of a single act or objective, the verdict does not foreclose the trial court from imposing multiple sentences for divisible acts. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101; *People v.* Nguyen (1988) 204 Cal.App.3d 181, 190.) In such a case, "the trial court is entitled to make any necessary factual findings not already made by the jury." (*People v. Centers,* at p. 101.)

---

[8]     We question whether the right to a jury trial is implicated by a sentencing decision under section 654. Section 654 has been described as a statute that mitigates punishment. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339, fn. 6.) Further, the California Supreme Court has previously held that a trial court's decision to sentence consecutively does not implicate a defendant right to a jury trial because it is a " 'sentencing decision[ ] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[ ] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' " (*People v. Black* (2007) 41 Cal.4th 799, 823.) We need not reach this issue, however, as we find the trial court's rejection of section 654 is consistent with the jury verdicts.

This case was tried under three theories of liability: (1) Gordon was a direct perpetrator of the robberies and the carjacking; (2) Gordon was a direct perpetrator of the robberies and aided and abetted Cesar S. in the carjacking; or (3) Gordon was a direct perpetrator of the robberies and was liable for the carjacking under the natural and probable consequences doctrine. The same theories were argued for Acosta, who joins in Gordon's arguments here. Nothing in the jury's verdicts indicates which theory of liability it relied on in convicting Gordon or Acosta of carjacking.

The prosecutor's factual theory was that the three men intended to commit the carjacking when they first approached the victims, but the jury was not required to accept this factual scenario to convict appellants. Gordon argued to the jury that the robbery was complete before the carjacking began, that is, the men had achieved their objective of taking personal property from the victims and were leaving the scene when the carjacking occurred. Under this factual scenario, the spontaneous start-up of the Mercedes then gave Cesar S. the idea to take the car.

While a newly formed intent to steal additional property might not alone be sufficient evidence to show multiple objectives under section 654, there is more evidence than that in this case. Washington testified that when Walker came out from his house and looked around the side of his garage, the "guys with the guns took off running." Gordon went to the passenger side of the Mercedes and Cesar S. got into the car. Gordon got into the car and Acosta ran off down the street. The Mercedes was later found abandoned but essentially undamaged. These facts support an inference that Cesar S. and appellants took the car when they became concerned about Walker's return to the scene

47

and decided to take the car to flee quickly without waiting for the Lincoln to return. This would constitute a separate objective from the robbery itself. Alternatively, the men could simply have decided to take advantage of the car's spontaneous start up. "[I]n the absence of some circumstance 'foreclosing' its sentencing discretion . . . , a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial." (*People v. McCoy, supra,* (2012) 208 Cal.App.4th at p. 1340.)

X.    *The Trial Court Did Not Err in Imposing the Upper Term on Gordon for the Robbery Conviction.*

Gordon contends the trial court abused its discretion in imposing the upper term for the count 2 robbery conviction because the trial court relied on aggravating circumstances which related to the gang involvement and gun use and those facts were already the basis for separate enhancements. Gordon claims the only cognizable circumstance in aggravation is his juvenile record. He maintained this factor is relatively minor and argues we may not speculate as to whether the trial court would have imposed the upper term based on this fact alone.

A.    A trial court has broad discretion in determining the appropriate term for a conviction.

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . .  In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further

48

evidence introduced at the sentencing hearing.  The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b).)

"Even with the broad discretion afforded a trial court under the amended [2007] sentencing scheme, its sentencing decision will be subject to review for abuse of discretion.  [Citations.]  The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.'  [Citation.] As under the former scheme, a trial court will abuse its discretion under the amended scheme if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

> B.  <u>The trial court did not rely on improper factors or otherwise abuse its discretion in sentencing Gordon to the upper term.</u>

The trial court explained its sentencing choice as follows: "Mr. Gordon has a significant prior criminal record. . . . Mr. Gordon was the shot caller on this particular mission into opposing gang turf."  The court also described Mr. Gordon as the more active participant in the robbery.  The court also stated it agreed with four of the five factors listed in Gordon's probation report.  The court did not repeat or list those factors, but the following four factors are listed: (1) the manner in which the

crime was carried out indicated planning, sophistication or professionalism; (2) defendant had engaged in violent conduct that indicates a serious danger to society; (3) defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; and (4) the defendant's prior performance on probation or parole was unsatisfactory.

Gordon is correct that some of the circumstances listed in the probation report are related to the gun use or gang enhancements. The only violent conduct in the case was the use of a gun, and the planning for the robbery was premised in part on Gordon and Acosta's texts about acquiring a gun and their plan to commit the crimes in a rival gang's territory. "[T]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b).)

Gordon acknowledges, however, there is factual support for one other circumstance listed in the probation report and discussed by the trial court: his prior criminal record. He agrees this was a permissible factor to consider, but argues that we may not "speculate" whether the trial court would have imposed the upper term based solely on this factor. (*People v. Kozel* (1982) 133 Cal.App.3d 507, 540.)

We find two proper circumstances which support imposition of the upper term and further find the trial court's own remarks at sentencing demonstrate the court would have imposed the upper term based solely on those factors. The court discussed only those two factors. The first factor he identified was Gordon's prior criminal record. The trial court noted in contrast that Acosta had no prior record. The trial court also

emphasized Gordon's role as the more active participant in the robbery, with Acosta following Gordon's lead. The court then sentenced Gordon to the high term and Acosta to the mid-term.

Apart from their criminal record and participation in the robbery, the "aggravating" circumstances listed for the two men in their probation reports were virtually identical.[9] This strongly indicates the trial court based its imposition of the upper term on Gordon's criminal record and leadership role, and not the factors in the probation report. Our conclusion is reinforced because the trial court repeated, immediately before sentencing Acosta to the mid-term for the robbery, that Acosta was more passive.

Gordon contends there is no factual basis for the trial court's conclusion that he was the more active, leading participant in the robbery. We find such a basis. Gordon was in the front of the group as it approached the victims, with Acosta and Cesar S. following. Gordon was the only one of the three robbers to speak. He initiated small talk about the Mercedes, potentially to put the victims off guard. It was he who told the victims to empty their pockets; he later told Acosta to take a chain necklace from one of the victims.

---

[9] Acosta's report referred to the crime involving great violence and also being carried out in a manner demonstrating planning, sophistication and professionalism. Gordon's report, as we note, also referred to violent conduct and the crime being carried out in a manner demonstrating planning, sophistication and professionalism.

XI.     *If the Gang Enhancements Are Again Found True, the Trial*
        *Court Must Avoid Double Punishment for Appellants' Use of*
        *a Firearm.*

Acosta contends, and respondent agrees, that the 10-year gang enhancement term added to his sentences for the attempted robberies pursuant to section 186.22, subdivision (b)(1)(C), must be modified to five year terms pursuant to section 186.22, subdivision (b)(1)(B), if the term remains intact after remand. The People agree that Gordon's enhancement term on one of the attempted robberies (Count 4) must be modified as well. The People do not agree that Gordon's sentence on count 3 must be modified. We reach the same conclusions as the People. After our original opinion issued, the trial court made these modifications. The gang enhancements have now been reversed. Should the gang enhancements be found true on remand, our reasoning on sentencing will still apply, as follows.

Section 1170.1, subdivision (f), prohibits the imposition of more than one enhancement for use of a firearm as to a single offense: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury."

In *People v. Rodriguez* (2009) 47 Cal.4th 501, 504, the California Supreme Court held that section 1170.1, subdivision (f), prohibited imposition of an aggravated gang enhancement (§ 186.22, subd. (b)(1)(C)) and a firearm enhancement (§ 12022.5, subd. (a)) as part of a sentence for

assault with a firearm.  The Supreme Court noted that both the enhancement for personal use of a firearm under section 12022.5 and the gang enhancement fell within the scope of section 1170.1, subdivision (f).  (*Rodriguez*, at pp. 505, 508.)  The gang enhancement under section 186.22, subdivision (b)(1)(C), applied to the assault with a firearm conviction because it was a violent felony under section 667.5, subdivision (c)(8) (firearm use during felony).  (*Rodriguez,* at p. 509.)  Therefore, because section 1170.1 prohibits the imposition of two enhancements based on the same firearm use, the Supreme Court reversed the sentence and remanded.  (*Rodriguez*, at pp. 505, 509.)

Here, appellants were sentenced on counts 3 and 4 under section 186.22, subdivision (b)(1)(C) because the attempted robberies in this case were "violent" felonies.  Attempted robbery is a "violent felony" only pursuant to the firearm use provision in section 667.5, subdivision (c)(8). Accordingly, the only basis for imposing the section 186.22, subdivision (b)(1)(C), gang enhancement is Gordon's and Acosta's personal use of a firearm in count 4 and appellant Acosta's personal use of a firearm in count 3. Acosta was also sentenced on counts 3 and 4 under section 12022.53, subdivision (b) for his firearm use.  Gordon received a section 12022.53, subdivision (b) enhancement for his firearm use only on count 4.  Under *Rodriguez*, the same firearm use cannot be used to impose both the firearm enhancement (§ 12022.53, subd. (b)) and the aggravated gang enhancement (§ 186.22, subd. (b)(1)(C)), and so that gang enhancement cannot be imposed.

A lesser gang enhancement is, however, permissible under the facts of this case.  Appellants were convicted in counts 3 and 4 of attempted robbery, which is a "serious felony" under section

53

1192.7, subdivisions (19) and (39).  Accordingly, the five-year gang enhancement under section 186.22, subdivision (b)(1)(B), applicable when the underlying felony is a "serious felony," should be imposed on count 3 for Acosta and on count 4 for both Gordon and Acosta.

Gordon's sentence on count 3 need not be modified. No firearm enhancement was imposed on that count.  Gordon contends that the gang finding was used twice to increase his sentence and the principles underlying the holding in *Rodriguez* should apply to bar such double use.  The holding in *Rodriguez* is based on section 1170.1, subdivision (f), which by its terms applies to *multiple* enhancements based (directly or indirectly) on being *armed* or using a *firearm*.  The language of that subdivision does not apply to multiple enhancements based on a gang finding.  More importantly, Gordon did not receive multiple enhancements based on the gang finding.  He received only one enhancement:  the gang enhancement itself.

Acosta's sentence on counts 3 and 4 should be separate terms of eight months for the attempted robbery conviction plus three years and four months for the firearm enhancement and one year and eight months for the gang enhancement.

Appellant Gordon's sentence on count 4 should be eight months for the attempted robbery conviction plus three years four months for the firearm enhancement and one year eight months for the gang enhancement.  His sentence on count 3, which consists of eight months for the attempted robbery conviction plus three years four months for the gang enhancement, remains unchanged.

54

XII. *The Abstract of Judgment for Each Appellant Has Been Corrected for Count 1.*

Appellants contends and respondent agrees the abstract of judgment should be corrected to show the applicable statutory authority for their sentence for the count 1 carjacking conviction. We agree as well.  The correct authority for the life term with a 15-year minimum for carjacking for the benefit of a criminal street gang is section 186.22, subdivision (b)(4)(B).  This correction has been made and should be carried over to any future amended abstracts if the gang enhancements are again found true.

XIII. *The Abstract of Judgment for Each Appellant Should Be Amended to Strike the Order That the Determinate Sentences Must Be Completed Before the Indeterminate Sentences Begin.*

Appellants contends the abstract of judgment should be corrected to reflect the trial court's order that the determinate and indeterminate sentences be served concurrently.  Respondent agrees.  We agree as well. This correction has now been made and should be carried over, if necessary, to any future amended abstracts.

XIV. *Appellants Have Not Demonstrated They Were Denied the Opportunity to Make a Record for a Youth Offender Parole Hearing.*

Appellants contend this matter must be remanded under section 3051 and *People v. Franklin* (2016) 63 Cal.4th 261 to provide them sufficient opportunity to make a record of mitigating evidence for use in a future youthful offender parole

hearing. Appellants have not demonstrated they were denied such an opportunity in the trial court.

"A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger . . . at the time of his or her controlling offense." (§ 3051, subd. (a)(1).) "[T]he board, in reviewing a prisoner's suitability for parole . . . shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)

In *Franklin*, the defendant was 16 years old when he committed murder and the trial court was obligated by statute to sentence him to two consecutive sentences of 25 years to life. (*Franklin*, *supra*, 63 Cal.4th at p. 268.) The defendant was sentenced in 2011, prior to the enactment of Senate Bill No. 260 on January 1, 2014. (*Franklin*, at pp. 268, 276.) Our Supreme Court determined it was not clear if the defendant had sufficient opportunity at sentencing to "make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense" to enable the Board to "properly discharge its obligation to 'give great weight to' youth-related factors." (*Id.* at p. 284.) The Supreme Court therefore remanded the case to the trial court for a determination whether the defendant had an opportunity to make this record. (*Ibid.*)

Here, appellants were 18 years old when they committed the charged offenses in September 2016. Their sentencing hearing was held in December 5, 2017, nearly two years after section 3051 was made applicable to them and 18 months after

56

*Franklin* was decided.  Appellants had sufficient opportunity to request a *Franklin* hearing and to make a record of their youthful characteristics at sentencing.  That they did not avail themselves of these opportunities is not a reasonable basis to conclude the trial court erred.  Both appellants had the opportunity to submit sentencing memorandum detailing any mitigating evidence; Acosta in fact submitted a sentencing memorandum.  At the sentencing hearing, the trial court repeatedly invited defense counsel to be heard regarding appellants' sentences.  The record does not show appellants were denied the opportunity to present mitigating evidence for future use.

Appellants contend that even if there was a theoretical opportunity for them to present evidence, their trial counsel was ineffective in failing to request a *Franklin* hearing.  The facts of a *Franklin* hearing do not fit easily into an ineffective assistance of counsel analysis.  To use the language of such a claim, appellants have not demonstrated a reasonable probability of a more favorable outcome if counsel had requested such a hearing, that is they have not shown that there was favorable evidence to place in the record during such a hearing.  Similarly, counsel may have made the reasonable tactical decision to forgo a *Franklin* hearing because counsel did not believe there was any evidence to present at such a hearing or because counsel was concerned that the risk of negative information coming to light and being memorialized at such a hearing outweighed the possible benefit from mitigating evidence.  Appellants have not shown ineffective assistance of counsel.

## DISPOSITION

The true findings on the section 186.22 gang enhancement allegations are reversed and remanded for a new trial.  The judgments of conviction are affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.


We concur:


GRIMES, Acting P. J.


WILEY, J.